UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:12-cv-2928-T-26EAJ

CULBREATH ISLES PROPERTY OWNERS
ASSOCIATION, INCORPORATED;
ORLINE M. SIDMAN; and FLORIDA
POLICYHOLDERS, LLC,

          Plaintiffs,

                                       14 August 2015
-vs-                                   8:55 a.m.
                                   Courtroom 15B
TRAVELERS CASUALTY & SURETY COMPANY,
OF AMERICA,

          Defendants.
-------------------------------------/

TRANSCRIPT OF PROCEEDINGS
*(BENCH TRIAL – VOLUME 4)*
BEFORE THE HONORABLE RICHARD A. LAZZARA,
UNITED STATES DISTRICT COURT JUDGE


<u>APPEARANCES</u>

**For the Plaintiffs:**  **GEORGE A. VAKA, ESQUIRE**
                          *Vaka Law Group*
                          777 South Harbour Island Boulevard
                          Suite 300
                          Tampa, Florida 33602
                          Phone: (813)549-1799
                          Fax: (813)549-1790
                          gvaka@vakalaw.com


*(appearances continued on next page)*

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

**MARK PAUL BUELL, ESQUIRE**
**RAYMOND T. ELLIGETT, JR., ESQUIRE**
*Buell & Elligett, P.A.*
3003 West Azelle Street
Suite 100
Tampa, Florida 33609-5226
Phone: (813)874-2600
Fax: (813)874-1760
buell@belawtampa.com

For the Defendant:     **ANDREW B. TRAMONT, JR., ESQUIRE**
**BRADLEY B. ASERLIND, ESQUIRE**
*Rodriguez, Tramont, Guerra*
 *& Nunez, P.A.*
25 Alhambra Circle
Suite 1150
Coral Gables, Florida 33134
Phone: (305)350-2300
Fax: (305)350-2525
avt@rtgn-law.com

ALSO PRESENT            SUSAN SAYLOR (Courtroom Deputy Clerk)
PAUL MILITELLO (Court Security Officer)

REPORTED BY             SHERRILL L. JACKSON, RPR, FPR
*Federal Official Court Reporter*
801 North Florida Avenue
Suite 13A
Tampa, Florida 33602
Phone:  (813) 301-5041
stenorella@aol.com


*I N D E X   T O   P R O C E E D I N G S*

Page

CERTIFICATE OF REPORTER ............................  47

*I N D E X   T O   E X H I B I T S*

(None offered or received)

1            P R O C E E D I N G S     (8:55 a.m.)

2        THE COURT:  Mr. Vaka, you have any more witnesses?

3        MR. VAKA:  No, Your Honor.

4        THE COURT:  You rest?

5        MR. VAKA:  Yes, we do.

6        THE COURT:  Mr. Buell?

7        MR. BUELL:  No, Your Honor.

8        THE COURT:  You rest?

9        MR. BUELL:  Yes, sir.

10        THE COURT:  Mr. Tramont?

11        MR. TRAMONT:  Good morning, Your Honor.

12        At this time, on behalf of Traveler's, we would

13 move for directed verdict.

14        THE COURT:  Judgment as a matter of law?

15        MR. TRAMONT:  Pardon?

16        THE COURT:  Judgment as a matter of law.

17        MR. TRAMONT:  I'm sorry, I can't --

18        THE COURT:  Judgment as a matter of law is what

19 you want.

20        MR. TRAMONT:  Yes.  I'm sorry, Your Honor.

21        THE COURT:  On what basis?

22        MR. TRAMONT:  I'm sorry, on the basis that the

23 plaintiff has failed to carry the burden on the elements

24 that it is required to carry the burden on, hasn't shown

25 that the $900 an hour is a reasonable fee for the defense of

1    the underlying case.  There's no good faith.  There's no --

2          THE COURT:  What gives you the right to come in

3    here now and question the validity of that judgment?

4          MR. TRAMONT:  I can get into that, Your Honor,

5    because --

6          THE COURT:  Get into it right now.  Is this *a*

7    *Coblentz* agreement?  Is that what you're basing it on?

8          MR. TRAMONT:  It is a *Coblentz* agreement,

9    Your Honor, and the first -- the first item I want to answer

10   is when you raise the issue of whether the full faith and

11   credit --

12         THE COURT:  I don't think that applies.

13         MR. TRAMONT:  Okay.

14         THE COURT:  Right now, unless they can convince me

15   otherwise, this is a *Coblentz* agreement.

16         MR. TRAMONT:  It is.

17         THE COURT:  That's what it is.  And I don't know

18   if you've seen it.  They've given me some filings.

19         MR. TRAMONT:  I just saw it.  I just got it.

20         THE COURT:  Okay.  Well, I --

21         MR. TRAMONT:  I'd like the opportunity to --

22         THE COURT:  Hold on.  Hold on.  Let me -- I've got

23   so much stuff up here.

24         One of theirs -- here it is.  Here it is.  One of

25   their filings deals with vouching in -- I thought I had it

1    here.

2           Excuse me a minute.

3           It deals with vouching in.  Plaintiff's --

4    plaintiff Florida Policyholders, LLC's memorandum of law

5    regarding vouching in in Indemnity.

6           And where is it?  "Florida courts have

7    specifically applied the foregoing principles" -- I'm not

8    going to go into them -- "in instances involving a liability

9    insurer's wrongful refusal to defend its insured against a

10   third party's complaint allegation.  See generally *Gallagher*

11   *vs. Dupont,* 918 So.2d 342," a decision by the Fifth District

12   Court of Appeals in 2006; and then parenthetically they say,

13   "Where the insurer has notice of a proceeding against its

14   insured and is afforded an opportunity to appear and defend,

15   a judgment rendered against the insured, in the absence of

16   fraud or collusion, is conclusive against the insurer as to

17   all matters determined therein, the settlement between

18   insured employee and third-party victim served to establish

19   insurer's liability."

20           I pulled that case.  It dealt with a *Coblentz*

21   agreement.  In fact, the opinion -- the opinion starts out,

22   "Michael C. Dupont sought to enforce by writs of mandamus

23   and garnishment in Federal Section 1983 Civil Rights

24   Judgment for $527,670.70 obtained by *Coblentz* agreement."

25           MR. TRAMONT:  Your Honor, I --

1          THE COURT:  So, what's your burden under *Coblentz*?

2          MR. TRAMONT:  My burden under -- their burden

3     under *Coblentz*, Your Honor --

4          THE COURT:  Oh, I'm sorry.  Well, you have a

5     burden too, don't you?

6          MR. TRAMONT:  I understand.  What they have to

7     show under *Coblentz* is indemnity, which the Eleventh Circuit

8     has already decided; wrongful refusal to defend; and, most

9     importantly, Your Honor, they have to show good faith and

10    reasonableness of their fee and that the -- and that the

11    insured made an effort to minimize the damages that are

12    now -- they're trying to foist upon the insurance company.

13          That case does not overrule the *Coblentz* doctrine,

14    which is absolutely applicable to this case.  They have to

15    come in and show all that, and we can defend by showing that

16    it was unreasonable.  And we provided evidence of that.  We

17    can defend by showing there was a lack of good faith, the

18    lack of good faith being evidenced by the fact that

19    Mr. Buell did not have the authority of his client to sign

20    this settlement agreement, the lack of good faith being

21    shown by he did not have the consent of the insured because

22    he couldn't have had the consent of the insured, and the

23    lack of good faith being shown by there being no effort on

24    the part of our insured, Culbreath, to minimize the fee.

25          THE COURT:  Doesn't the evidence show that when

1  she was competent, she told Mr. Buell, "I want two things:

2  I want this lawsuit dismissed, and I want my fees taken care

3  of"?

4       Now, let's assume she became incompetent prior to

5  the execution of this agreement.  Does that rescind the

6  authority she gave him?

7       MR. TRAMONT:  The authority is determined at the

8  time of the execution of the contract.  If his theory was

9  correct --

10       THE COURT:  You know, we're not -- this -- this is

11  a unique case.  We're not questioning Mr. Buell's competency

12  when he executed it.

13       MR. TRAMONT:  No, we're not.

14       THE COURT:  And it's not as if she executed it and

15  now we're saying, "Well, was she competent when she executed

16  it?"  He executed it on her behalf.

17       MR. TRAMONT:  You can't do that.  You can't do

18  that, Your Honor.

19       THE COURT:  Why not?

20       MR. TRAMONT:  Because you have to -- the client

21  has to be able to review what it is the client is going to

22  be agreeing to.

23       THE COURT:  Where is that law?

24       MR. TRAMONT:  I'll show you the law, Your Honor.

25  I'll show you when I make my closing argument.  But, again,

1   for one thing, the competency or the authority or lack of

2   authority is determined at the time of the execution of the

3   contract, which is December 23rd.  You heard that she was

4   in --

5          THE COURT:  I read Judge Steele's opinion that you

6   cited to me -- Judge Steele from Fort Myers.

7          MR. TRAMONT:  In which case, Your Honor?

8          THE COURT:  Jeez, you cited it to me.  In fact,

9   his opinion was cited by my old court, the Second District

10  Court of Appeals.  Like I said, I thought I brought it in

11  here with me.

12         Well, in Judge Steele's case, they were

13  questioning the competency of the person who actually

14  executed the agreement.  We don't have that here, and I know

15  he said you determine it at the time of the execution, but

16  this is just --

17         MR. TRAMONT:  Your Honor, you can't -- the

18  attorney -- when the attorney does that, the attorney has to

19  have gone over with his client at some point all the points

20  of the agreement, and you may remember that Mr. Buell

21  testified --

22         THE COURT:  Why?

23         MR. TRAMONT:  Because the client, in this case --

24  look what happened, Your Honor.  In this case, the client

25  had a judgment, had a chance -- had already gotten summary

1  judgment, was in a position to collect against Culbreath.

2  Mr. Buell made the decision after being offered on

3  December 19th or so by Mr. Friscia to exchange that judgment

4  against Culbreath in exchange for a cause of action against

5  Travelers.

6         Mr. Buell admitted himself he never went over that

7  with Miss Kirkwood.  That offer didn't come up until

8  Miss Kirkwood was uncommunicative.  That was the evidence.

9         Miss Kirkwood never knew that she would be

10 exchanging a judgment in exchange for a -- the right to sue

11 Travelers on a coverage action pursuant to a *Coblentz*

12 agreement.  Who knows what she would have said.

13         THE COURT:  Which was unknown; right?  Is that

14 what you're saying?

15         MR. TRAMONT:  She didn't know.

16         THE COURT:  She didn't know.

17         MR. TRAMONT:  She didn't know, and he had never

18 discussed that with her.  That's the important point,

19 Your Honor.  She waived considerable rights.  And when

20 Mr. Buell testified, "Yeah, she would have agreed to it,"

21 all that, you can't have that as a matter of public policy,

22 Your Honor, because then you'd have every attorney whose

23 client somehow becomes uncommunicative or has a stroke or

24 dies or whatever say, "I could sign it for her.  I knew what

25 she wanted."

1    Just look what happened -- you know, they didn't

2  even settle the counterclaim, a counterclaim that was

3  ultimately settled for $1200.  He said at that time he

4  needed a guardian to be appointed, but he didn't have --

5  didn't need a guardian to have her give up the right to

6  collect against Culbreath?

7    She had a bird in the hand, Your Honor.  You know,

8  my opinion is that he was in a conflict position.  He should

9  have said to her, "You know, Phyllis, here's where you are.

10  You can go right in and you can collect."

11    Now, he makes the argument that they were going to

12  dissolve, we wouldn't be able to collect.  I think that's

13  been shown to be not credible, but she should have made the

14  decision.  She should have been able to make the decision.

15    THE COURT:  Didn't Mr. Friscia testify there were

16  discussions about dissolving the homeowners association?

17    MR. TRAMONT:  Well, that's what Mr. Friscia said,

18  but, you know, the president of Culbreath, Mr. Chibani,

19  never heard that.  Mr. Friscia said that to Mr. Frick.

20    THE COURT:  But I've got to look at the evidence

21  in the light most favorable to them.  Mr. Friscia's

22  testimony stands there.

23    MR. TRAMONT:  You know what, Your Honor?  It

24  doesn't matter.  He cannot make the decision.  The cases

25  that we've cited in our brief is that even if the attorney,

1    in good faith, believes it's an appropriate settlement, you

2    can't do it.

3            Your Honor, think of what would happen.  If they

4    walked in to you, if you were the state court judge, and you

5    say, "Hey, we're at the end of the ball game here.  Where is

6    Miss Kirkwood?" and he said, "She's in the hospital.  She's

7    had a stroke.  I can't talk to her.  She can't talk to me,"

8    your question would be, "Have you gone over this with her?"

9    Because you'd see that they were giving up the right to

10   proceed against Culbreath, who she's been chasing for a long

11   time.

12           And then I think Your Honor would have said,

13   probably to Mr. Buell, "Has she looked at it and has she

14   told you to sign it?  Because you're saying here, Mr. Buell,

15   it's been expressly authorized and you've been instructed to

16   sign it by her."

17           And he would say, "No.  I haven't had the" -- "I

18   haven't had a chance to do that because of her condition."

19           And then you would have said, "Well, when did she

20   tell you you could settle?"

21           In the beginning of the case, she wanted this

22   whole matter over.  She didn't want to be sued.  Every

23   client who gets sued feels that way, Your Honor.  That's

24   every defendant's position who's dragged into court:  "Get

25   me out of this.  I don't want to pay any more attorneys'

1  fees."

2          That does not give the attorney the right to

3  settle it without going over the fee -- without going over

4  the settlement agreement.

5          Now, Mr. Buell said, "That's the way I do it all

6  the time.  Even if she was sitting there in the room with

7  me, I wouldn't have needed to show it to her."

8          Really?  I don't think so, especially when you're

9  telling the court that, "She expressly authorized and

10  instructed me to sign it."

11          Now, that's just not a stock provision like they

12  say.  That's a representation by him to the court, because

13  that's the way it's supposed to be done, and they know it.

14  So, that's why it was in there.  But it didn't happen.

15          And so, for that reason, Your Honor, that's why

16  you don't let attorneys just sign settlements on behalf of

17  their clients saying, "Yeah, I knew she would have wanted

18  this.  She didn't care about collecting from Culbreath.  She

19  said, 'Okay, let me collect against Travelers.  We'll sue

20  Travelers,'" and then you wait five years later and say,

21  "But I'm still going to get the $20,000, but my law firm

22  will get $300,000."  That doesn't work that way, Your Honor.

23          THE COURT:  What else?

24          MR. TRAMONT:  Your Honor, for these reasons, we

25  don't -- the cases that they cite that we just -- we'll have

1  to take a look at them.  I'd like the opportunity to respond

2  because we just got it this morning, and they just simply

3  haven't carried the burden.  They haven't shown authority.

4  They haven't shown consent.  They haven't shown

5  ratification.  And for those reasons, Your Honor, we move

6  for entry of judgment.

7          THE COURT:  Hold on a minute.

8          They have a three-fold burden under *Coblentz*:

9  Prove coverage --

10          MR. TRAMONT:  That they did.

11          THE COURT:  And I'm bound by the Eleventh Circuit.

12  All right?  Wrongful refusal to defend --

13          MR. TRAMONT:  (Nods head.)  We don't believe there

14  was, Your Honor, because we weren't really given the

15  opportunity, but I understand that --

16          THE COURT:  Looking at the evidence in the light

17  most favorable to them, they put everybody -- they even put

18  you on notice about the fee hearing and what they were going

19  to ask for.

20          MR. TRAMONT:  Okay, let me --

21          THE COURT:  In my view --

22          MR. TRAMONT:  If I had gone to that hearing,

23  Judge, and lost, that's when you would have been imposing

24  the full faith and credit doctrine on me.

25          THE COURT:  Well -- and finally that the

1  settlement was reasonable and made in good faith.

2          MR. TRAMONT:  Yeah.

3          THE COURT:  And your contention is the settlement

4  was not reasonable?

5          MR. TRAMONT:  Yep.

6          THE COURT:  And not in good faith?

7          MR. TRAMONT:  And the other cases that address

8  *Coblentz*, Your Honor, they go on to say that good faith --

9  no good faith and also that the insured made an effort to

10 negotiate the settlement so that it just -- they didn't just

11 lie down, that they really tried to keep the damages down.

12 And we'll show you --

13         THE COURT:  Well, that goes to reasonableness.

14         MR. TRAMONT:  Well, I think it's part of the same

15 thing.  But no, reasonable can be determined as to what --

16         THE COURT:  What --

17         MR. TRAMONT:  -- is normal -- the hourly rate is

18 normal, and you'll have to decide that.  We don't think it

19 was, but there's a separate element this is often imposed.

20 We'll show you the cases where when the insured does a

21 lay-down and says, "Pull whatever number you want for your

22 fees.  As long as you don't sue us, we don't care.  Go after

23 the insurance company."

24         And we'll show that's what happened here.  That's

25 the evidence.  That's another -- that's kind of a

1   sub-element.

2          THE COURT:  And then what do you have to prove?

3          MR. TRAMONT:  It's their burden because they are

4   trying to enforce it.

5          THE COURT:  But, you know, the Eleventh Circuit

6   has also said, "When addressing what an insurer must prove

7   to prevent enforcement of a consent judgment," and then

8   reasonable --

9          MR. TRAMONT:  Yeah, we -- I think I know the case

10  that you're citing, Your Honor.

11         THE COURT:  And it's --

12         MR. TRAMONT:  And the burden is on them.

13         THE COURT:  *Mid-Continent Casualty vs. American*

14  *Pride.*

15         MR. TRAMONT:  The burden is on them when they're

16  trying to enforce it.  If we were trying to declare that it

17  was unenforceable -- let's say we filed a dec. action to

18  declare that it's unenforceable, the burden would be on us.

19  But in any case, the same elements are raised.

20         We think we have -- we have proof, Your Honor,

21  that it was unreasonable and that there was bad faith.

22         So, it's their burden, but we have proof as well

23  to rebut that, and we think our proof is more credible, and

24  we'll show you in my closing, Your Honor, if you'd like.

25         THE COURT:  All right.

 1          Mr. Vaka.

 2          MR. VAKA:  Thank you, Your Honor.

 3          THE COURT:  What's the -- what exhibit is the

 4  settlement agreement?  What's the exhibit number?

 5          MR. TRAMONT:  For which one?

 6          THE COURT:  The settlement agreement that was

 7  presented to Judge Baumann.

 8          MR. TRAMONT:  Okay, the joint stipulation is

 9  Exhibit -- Defendant's Exhibit 23.

10          THE COURT:  Would you give me that, Susan, please.

11          MR. TRAMONT:  They introduced it first, so --

12          MR. VAKA:  I think it's Plaintiff's 112.

13          THE COURT:  Thank you.

14          Mr. Vaka.

15          MR. VAKA:  Thank you, Your Honor.

16          Let me start by pointing out that -- you just

17  asked Mr. Tramont for some law to support his contention

18  that Mr. Buell was required to read through the entire

19  document with the client before he had the authority to

20  enter into the agreement.

21          Mr. Bu-- excuse me, Mr. Tramont provided you none,

22  because there are none to be cited to Your Honor.  The only

23  cases that they have ever cited to Your Honor concerning the

24  issue of consent --

25          THE COURT:  Here's my problem:  Look at Paragraph

1   20 on page 7 of this agreement.  "The parties acknowledge

2   and agree that all parties," which I take to mean

3   Miss Kirkwood, "and their counsel participated in

4   negotiating and drafting this agreement."

5          That's not true, is it?

6          MR. VAKA:  Not in the drafting part, no.  She did

7   not.

8          THE COURT:  How about negotiating it?  There's

9   more in this agreement than, "Get me out of the lawsuit and

10  get my fees paid."

11         MR. VAKA:  Well, let me answer it this way,

12  Your Honor:  There's a -- let me -- I don't mean to turn my

13  back on you; I'm just trying to get a case here, and it's

14  one of the cases that we talked about.  And I want to get

15  back, because Mr. Tramont said something very interesting at

16  the end of this about, well, if we were trying to set aside

17  the agreement, we'd have a different burden; and I thought

18  the whole issue of consent is what goes to the question of

19  whether or not he's trying to set aside this judgment.

20         If this is just a *Coblentz* case, which is not what

21  they've said this is -- they've specifically told the

22  Eleventh Circuit it was not.  But if that's what we're --

23         THE COURT:  I don't care what they told the

24  Eleventh Circuit.

25         MR. VAKA:  Okay.

1          THE COURT:  This is a *Coblentz* agreement.  One of

2   the key cases you just cited me in your memorandum filed

3   this morning deals with *Coblentz*.

4          MR. VAKA:  The thing that distinguishes this case,

5   Your Honor, from a typical *Coblentz* agreement, besides the

6   fact that it's defense and all that, is this thing:

7   Typically in a *Coblentz* situation, the insurance company

8   says, "No coverage.  We're not going to participate," and

9   the parties go do what you want, just like Travelers did in

10  this case.  And the parties go, and without any notice to

11  the insurance carrier, they go negotiate the material terms

12  of the deal or they execute a deal and then they try to

13  enforce.

14          The biggest difference between a typical *Coblentz*

15  and this case is that the conversation that occurred on

16  December 13th between Mr. Tramont -- initiated by

17  Mr. Tramont and Mr. Friscia.  And in that conversation --

18  and this testimony is undisputed -- Mr. Friscia told

19  Mr. Tramont about the material terms of the agreement that

20  they were going to enter into, and Your Honor even asked

21  Mr. Friscia -- and you'll recall this -- "Did you tell him

22  about the $295,000?"

23          And Mr. Friscia said, "Yes."

24          Mr. Friscia continued to say that he told him

25  about all the material terms of the agreement.  He wanted to

```
 1   make sure that he was being totally open.  That is a very

 2   big distinction, Your Honor, and that's the reason why I

 3   cited you to the law of indemnity and vouching in, because

 4   really all we're talking about, an insurance policy is

 5   simply -- we're going back and we're talking about

 6   contractual indemnity, and the Eleventh Circuit has

 7   recognized that in the cases that we've cited in the memo

 8   that we've given to you.

 9          Here the thing that distinguishes this above all

10   others is Travelers' agent had actual knowledge of the terms

11   of the agreement.  He did not object.  He did not seek to

12   move into the proceedings, as they certainly could have

13   done.  They did not offer to defend under a very limited

14   issue of the amount of the fee under a reservation of

15   rights, which they clearly could have done.

16          THE COURT:  Assuming I accept your argument, if

17   the settlement is tainted by fraud or collusion, it's still

18   no good; right?

19          MR. VAKA:  Uh -- if Your Honor finds there's

20   fraud -- not the settle -- I think it was the judgment,

21   whatever.  If the court finds that there was fraud or

22   collusion, okay, then the bottom line is you're right,

23   Your Honor, that's one of the things that we have to talk

24   about; and then the question becomes, okay, can you set

25   aside the agreement?  And we've got some cases that talk
```

1    about that.

2         If you have an offer and a -- and a contract by an

3    incompetent person, what's the legal effect of that finding?

4    And the legal effect of that finding is that the judgment is

5    not void.  It is voidable.  And it is one of those judgments

6    that needs to be set aside within one year under the Florida

7    Rule 1.540, which allows you to set aside a judgment.

8         What happened here was that Travelers made a

9    conscious decision.  Mr. Tramont never came forward at any

10   point in these proceedings to ever disclose to you or

11   anybody else on this planet that he had initiated a call to

12   Mr. Friscia and was disclosed the material terms of the

13   settlement agreement; and, nevertheless, he has continued to

14   prosecute or defend his action on the basis that, "We didn't

15   know this is unreasonable."  And that's not true.

16        There was notice to Travelers.  Travelers had the

17   opportunity to object, to raise whatever reason it wanted to

18   raise, and it choice not to.  And the law on vouching in

19   says at that point in time you're done.

20        Now, if they want to say that there was some fraud

21   in the judgment, there's a remedy for that.  Unfortunately,

22   the remedy doesn't lie here, Your Honor.  The remedy lied in

23   Florida state court.

24        We also believe that we've satisfied -- even if

25   this is a *Coblentz* case, if you view the evidence in the

1　light most favorable to us, Mr. Friscia's confession that he

2　continued to be open and to provide all the information

3　pertaining to the settlement to Travelers, in our opinion,

4　is good faith as a matter of law.  He was totally, totally

5　transparent.

6　　　　　In terms of collusion, the testimony's totally the

7　opposite of that.  Both Mr. Buell and Mr. Friscia testified

8　that this was vigorous negotiations.  They want you to focus

9　in, Judge, on one thing, which is the amount.

10　　　　　This settlement wasn't just the amount, and it's

11　not just Mr. Buell's and Mr. -- and Miss Kirkwood's conduct

12　that needs to be looked at.  They focused it in just on

13　that.  You need to take a step back.  Was this settlement

14　agreement reasonable or unreasonable?  What did the parties

15　have to lose?  What did Culbreath Isles have to lose?

16　　　　　Mr. Friscia testified about that.  What did he

17　have to give up?  He gave up his appeal.  He gave up his

18　right to attorneys' fees.  What did -- what did Ms. Kirkwood

19　get?  She didn't get just her attorneys' fees.  She got an

20　agreement that they would dismiss, and the effect of that

21　dismissal was going to be that they could never ever again

22　come after her with respect to this restrictive covenant and

23　the requirements that she maintain her yard in some way

24　other than the way that she was doing it.  That was done.

25　That was a done deal.

1          And so, in the context of the entire controversy,

2    I believe you need to look at the entire settlement, which

3    makes this different than a typical *Coblentz* agreement.  In

4    most of those cases that Your Honor is citing, and which are

5    the reported decisions on it, those cases typically involve

6    either a claim for a personal injury or property damage.  A

7    claim is made to a liability insurer, and the liability

8    insurer denies coverage, and the parties go enter into an

9    agreement and then try to shift that burden over to the

10   liability insurer.  That's not what we have here.  That's

11   not this case.

12          THE COURT:  Mr. Vaka, of course that's what we

13   have here.

14          MR. VAKA:  Your Honor, if I'm --

15          THE COURT:  You got a judge to give you a judgment

16   even though it's not for injuries or other types of damages,

17   but it's still a judgment for attorneys' fees.  It's a

18   judgment for money.

19          MR. VAKA:  That's part of it, Your Honor.

20          THE COURT:  It's a *Coblentz* agreement.  It's a

21   *Coblentz* agreement.  And where is it said it's not a

22   *Coblentz* agreement if you let the insurance carrier know,

23   "We're going to ask for a judgment for a million dollars"?

24          Are there cases that say that takes it out of the

25   realm of being a *Coblentz* agreement if the insurance

1  company's put on notice about the amount of the judgment?

2       MR. VAKA:  Your Honor, if you go through, I

3  believe even the *Coblentz* case that is actually, I think,

4  the last of the cases that are in the booklet, it talks

5  about this, talks about this being an issue of indemnity and

6  goes back to this notion of vouching in.

7       I believe we've even cited the case to a court

8  where the parties announced in open court the terms of a

9  settlement and the amount.  The indemnitor's attorney was

10  present and voiced no objection, and the court found that

11  that was sufficient notice; that if there was an objection,

12  they should have raised an objection to the amount at that

13  time and, as a result, the indemnitor was precluded from

14  challenging the reasonableness or any of the issues that

15  would have been melded into the judgment.

16       There's no -- there's not a single case that I've

17  been able to find that says that that law doesn't also apply

18  to insurance companies.  And, in fact, if you go through

19  many of the cases that we've cited, it has applied that to

20  insurance companies.

21       That's what makes this situation different,

22  because Mr. Friscia, in his efforts, as he testified, to try

23  to help his client and cover his client, went back again and

24  was totally transparent with these people, and they had the

25  opportunity at that point in time to prevent it from

1    happening, and they chose not to.

2             That was their strategy.  It's the strategy that

3    they tried to implement throughout the course of this

4    litigation.  But they certainly have not met their burden

5    on -- on a motion for judgment.

6             THE COURT:  What would happen if Mr. Tramont had

7    showed up at the fee hearing?

8             MR. VAKA:  If Mr. Tramont had showed up at a fee

9    hearing, Mr. Tramont, okay, could have --

10            THE COURT:  What would Judge Baumann have done?

11            MR. VAKA:  I'm assuming that if the parties said

12   that he was free to challenge the amounts, just as Mr. Buell

13   in that e-mail exchange with him back in November --

14            THE COURT:  Or would Mr. Buell or -- have

15   objected, "Judge he has no standing here"?

16            MR. VAKA:  The only thing I can tell you,

17   Your Honor, is that didn't appear to be the case based upon

18   the e-mail communications that were going back and forth.

19   In fact, Mr. Tramont was actively invited, and they were

20   surprised when he said that they didn't care about the

21   amount of the fees.  And we now know that's not true.  And I

22   can't, based on an e-mail, tell you whether it was ever

23   true.  I don't know.  But I know it's not true.

24            So, what we have here -- and I get -- let me kind

25   of just focus in on the *Coblentz*, and then I'm going to go

1    back to the consent part.

2         There is testimony from Mr. Friscia that he

3    believed that expert testimony was going to be offered

4    against his client such that with the application of a

5    multiplier, his client had a fee exposure of around

6    $400,000.  He negotiated that down by more than 25 percent.

7         There was testimony by Mr. Friscia that the Lewis

8    case ultimately settled for $212,000 and that Mr. Frick, I

9    believe, testified that the Lewises had actually paid

10   $274,000 for the legal services involved in this case.

11        So, that certainly is indicia of reasonableness

12   certainly when viewed in the light most favorable to our

13   position in this matter.

14        Mr. Tramont told you that he was going to prove to

15   you and that the evidence would be that Buell & Elligett was

16   the one that saw the need for the guardianship and

17   orchestrated Miss Sidman becoming the guardian and having

18   all of those proceedings go through and that they knew that

19   Miss Kirkwood needed the guardian; and yet, Your Honor asked

20   Miss Sidman on the stand yesterday, "Who was responsible for

21   having this guardianship established?" and she said she did.

22        And you asked, "Well, who are the lawyers who were

23   responsible for that?" and she said it was her neighbor,

24   Mr. Kelly.

25        And then you came right out and flat out asked the

1   question, okay, the one that he said that he was going to

2   have evidence to show, "Did Buell & Elligett have anything

3   to do with this?" and the answer was, "No."

4           So, there's no evidence that they defrauded

5   anybody.  It's not like they knew; and when they did know,

6   Your Honor, the evidence in this case -- the e-mail between

7   Lofaro and Buell, I believe, in February or March of 2011,

8   when Lofaro's trying to negotiate the counterclaim, when

9   Mr. Buell does know that his client is incapacitated, what

10  does he say?  "I haven't discussed the counterclaim with my

11  client.  I don't have authority."  He did the right thing

12  when he knew.

13          In the light most favorable to us and the evidence

14  in the light most favorable to us, there clearly was no

15  fraud.

16          And was there collusion?  Again, the testimony of

17  both lawyers to the negotiation shows that it was an arm's

18  length transaction that went back and forth.

19          The last exhibit that we moved into evidence

20  yesterday -- I think Mr. Bush might have had it -- was the

21  December 16, 2010, letter that had been sent from Mr. Buell

22  to Mr. Friscia, and it came back with Mr. Friscia's

23  handwritten notes and his initials going down on the

24  paragraphs.

25          They were negotiating this thing until the day --

1   much after the day for the hearing on the attorneys' fees.

2   They were negotiating this thing through the 23rd on the

3   details that they thought were important.   But the material

4   terms never changed.

5          Now, let me get into this consent thing, because

6   there's a Southern District case that is not reported, but

7   we cited it in our memorandum of law regarding consent.

8   It's the *Vital Pharmaceuticals* case.   It's at 2007 WL

9   1655421, Southern District of Florida, 2007.

10          THE COURT:   What's the cite again?

11          MR. VAKA:   It's with the memo that we had

12   previously given to you.

13          THE COURT:   Give me the cite again.

14          MR. VAKA:   Yes, Your Honor.   2007 WL 1655421,

15   Southern District of Florida, 2007.

16          Like Travelers, one of the parties there argued

17   that the attorney for the party who negotiated the

18   settlement agreement did not have the authority to enter

19   into the settlement agreement, and the court there wrote

20   that while -- and they agreed that while he may have had the

21   authority to enter into the negotiations, he did not have

22   the ultimate authority to enter into the settlement

23   agreement.

24          And the court there wrote, "This is a distinction

25   without difference, because the authority to negotiate terms

1  of a settlement agreement necessarily includes authority to

2  enter into a binding agreement."  And that is precisely the

3  scenario we have here.

4          Ms. Kirkwood gave --

5          THE COURT:  Who signed the settlement agreement in

6  that case?

7          MR. VAKA:  The attorney.

8          THE COURT:  The client didn't?

9          MR. VAKA:  That's --

10         THE COURT:  Was the client trying to get out of

11 the agreement?

12         MR. VAKA:  That's right.  Yes, the client was

13 trying to get out of the agreement.  The attorney signed the

14 agreement.

15         THE COURT:  Did the court rely on Florida law?

16         MR. TRAMONT:  Yes.

17         MR. VAKA:  Yes.

18         THE COURT:  What Florida cases did it cite?

19         MR. TRAMONT:  It cited the case, Your Honor, that

20 said an attorney had to have clear and unequivocal

21 authority.

22         THE COURT:  No, no.  Wait a minute.  I just want

23 to know --

24         MR. TRAMONT:  It cited the same cases we rely on.

25         MR. VAKA:  It cites to basic contract principles,

1   Your Honor, some of the ones that we've cited.  It cites

2   *Robbie vs. Miami*, which is a contract case.  It cites *Gaines*

3   *vs. Nortrust Realty,* which is one of cases, I believe,

4   that --

5            THE COURT:  Who's the judge that wrote this

6   decision?

7            MR. TRAMONT:  Your Honor, Judge Middlebrooks, I

8   think.  And I think, Your Honor, if I recall -- I read that

9   case, and the client --

10           THE COURT:  I'm going to give you a chance to get

11  back up.

12           MR. TRAMONT:  Thank you.

13           MR. VAKA:  It was Judge James Cohn [sic].

14           THE COURT:  Oh, Judge Cohn, okay.

15           MR. VAKA:  I'm sorry, Your Honor --

16           THE COURT:  Okay.

17           MR. VAKA:  Here the testimony is undisputed.  I

18  think Your Honor even questioned somebody and said that she

19  was unwavering in the terms that she advised Mr. Buell to

20  negotiate.  He clearly had the authority to negotiate those

21  terms; and by implication, as a matter of law, he

22  unquestionably had the authority to enter into a settlement

23  that included those terms.

24           The next question that really wasn't addressed is

25  Mr. Tramont and Travelers have taken the position on the

1  ratification issue that because Miss Sidman was not familiar

2  with or well acquainted with all the terms, had --

3  really had -- had no appreciable understanding of the terms

4  of the settlement agreement, that there was not a

5  ratification; and we would disagree with that.

6         We believe there was a ratification as a matter of

7  law, Your Honor.  There was an application to a judge of

8  competent jurisdiction who was requested to give authority

9  through the guardian to pursue this action, and a lawful

10  order of that court issued giving her the authority to do

11  that, and thereafter she has pursued this case with all

12  vigor.

13         Most respectfully, we would argue that that

14  conduct, application for an order, obtaining the order, and

15  then vigorously pursuing this case is ratification as a

16  matter of law.

17         THE COURT:  Even though she didn't have any

18  specific knowledge of what was taking place?

19         MR. VAKA:  I don't -- Your Honor, I don't believe

20  that.

21         THE COURT:  She said that.  Basically she let the

22  lawyers do everything.  She told me she had no specific

23  knowledge about the -- I think, about the particulars of

24  this case.

25         MR. VAKA:  What she did say --

```
 1            THE COURT:  Did that fulfill her duties?  And I'm
 2   not disparaging her.  I wish I had a good friend like her,
 3   you know.  I mean, what she did was, you know -- you can't
 4   laud her enough for the -- for taking care of Miss Kirkwood,
 5   and I'm not here to disparage her.  But didn't she have a
 6   basic duty as a guardian to become acquainted with the legal
 7   proceedings, what's at stake, to the extent that she knew
 8   she had knowledge about the particulars?
 9            MR. VAKA:  Well, let me --
10            THE COURT:  I mean, you represent a lot of people
11   in your lifetime as a lawyer, I'm sure.  Don't you always
12   keep your client advised, "What do you think?  This is my
13   strategy.  Any problems with that, let me know now"?
14            From her testimony -- I gleaned from her testimony
15   that what would happen is she'd receive pleadings at the
16   house, and that was basically it.  Does that conform to her
17   duties as a guardian under Florida law?
18            MR. VAKA:  Well, I can't answer that, Your Honor.
19   I'm not a probate guy.  I couldn't answer that question for
20   you.  What I can tell you is that she also sat there and
21   testified in response to your questions, I believe -- and if
22   not, it was definitely in response to Mr. Tramont's
23   questions -- that she had an understanding that this lawsuit
24   would effectuate Ms. Kirkwood's intent to have her lawyers
25   get paid for the work that they had done on the Culbreath
```

1  Isles matter.  That is undisputed.  They -- they didn't

2  impeach her on that.  That's what she understood the primary

3  goal of this lawsuit to be.

4       Now, whether she was required to know all the ins

5  and outs of the procedural requirements of the law or how

6  that was going to be effectuated as a guardian, I don't

7  know.  But I know this:  I know nobody has applied for an

8  order subsequent to the one that was entered giving her the

9  authority to pursue this action that said, "She's not

10 qualified to be the guardian.  She doesn't understand; and,

11 Your Honor, you should reconsider this order that you issued

12 or you should withdraw it or you should do anything of the

13 kind."  That's never happened.

14       So, we're -- you know, Mr. Tramont made a

15 statement in opening about we're required to follow the

16 Eleventh Circuit and we're also required to follow the

17 orders of courts of competent jurisdiction who have been

18 given the legal authority to make many of the decisions

19 which have been made in this case.  And just like he would

20 like to go behind the judgment of Judge Baumann, he'd like

21 to go behind the judgment of Judge Isom in giving her the

22 authority to pursue this and then ratifying it when she did.

23 So --

24       THE COURT:  Let's assume at the time Mr. Buell

25 executed this settlement agreement that Miss Kirkwood's

1    incompetent.  What effect?

2          MR. VAKA:  The effect is it makes that contract

3    voidable at the option of the parties to the agreement.

4          Your Honor, if I can go back, I've got just a case

5    that -- we've cited to Your Honor in our trial brief many

6    cases to this effect.

7          THE COURT:  So, it's voidable?

8          MR. VAKA:  Voidable at either of the parties, yes.

9          THE COURT:  Within the framework of *Coblentz*, can

10   I then say it's voidable?

11         MR. VAKA:  You could say it's voidable as to --

12         THE COURT:  Can I void it?

13         MR. VAKA:  I don't think you can void it.  I think

14   the parties -- I think Culbreath Isles could void it.  They

15   could make that assertion.  I think actually the case law

16   really is the only party who could void it would be

17   Miss Sidman on behalf of Miss Kirkwood.  It's voidable as to

18   the mentally incompetent person, but it's not void.  That I

19   can tell you for sure.

20         Excuse me.  There's a case at 479 So.2d 221 out of

21   the Fifth District Court of Appeals, *Palmer vs. Palmer,* and

22   it's a 1985 decision, and it is a -- the case deals with a

23   motion for relief of judgment filed based upon the contract

24   that was entered on behalf of a -- a person who was not

25   mentally competent to contract and the court finding that

1 the 1.540 motion which had been granted should not have been

2 granted and reversed because it was untimely.  The court

3 stated quite clearly, "The contract of one who is not

4 mentally competent to contract is not void but is voidable."

5         We've cited to Your Honor a bunch of other cases

6 which stand for that exact same legal position.  In this

7 case, rather than seek an application to enforce and pursue

8 this case against Travelers, Miss Sidman had an opportunity

9 to -- to -- upon the advice of her counsel, if they thought

10 it was in the best interest of Miss Kirkwood, they had the

11 lawful authority to say the contract that -- they could have

12 made the same argument that he's making.  Okay?  "We

13 think" -- although there's no medical testimony in this

14 case, "We think that her condition on the date that

15 Mr. Buell executed the agreement was the same as it was when

16 whoever it was that found her to have her cognitive

17 abilities impaired found that to happen."

18         They could have brought in physicians who could

19 have given expert opinion as to what -- why it was that

20 Ms. Kirkwood was mentally incompetent; and at that point in

21 time, if it was in Mrs. -- in Miss Sidman's judgment, she

22 could have applied to the court for a determination that

23 that contract was voidable.

24         THE COURT:  When?

25         MR. VAKA:  She could have done it at any time

1  within a year after when she was appointed guardian, but she

2  didn't.

3          THE COURT:  And after she was given authority to

4  pursue this lawsuit?

5          MR. VAKA:  After she was given authority to pursue

6  this lawsuit and she pursued it --

7          THE COURT:  When Mr. Buell was representing her?

8          MR. VAKA:  I'm sorry?

9          THE COURT:  When Mr. Buell was representing her?

10         MR. VAKA:  Mr. Buell wasn't representing her at

11  the time that --

12         THE COURT:  Buell & Elligett was representing her

13  as of March of 2011; okay?  Right?

14         MR. VAKA:  They were -- they were -- they were

15  representing her after she applied for and was given the

16  authority to pursue the lawsuit.

17         THE COURT:  Right, and -- and the one-year period

18  went from December 23rd of 2010 to December 23rd of 2011.

19  Has anybody --

20         MR. VAKA:  It would have been from the date of the

21  judgment that was entered upon it.

22         THE COURT:  Okay.  Well, still, during that one-

23  year period of time, or a significant part of that time,

24  Buell & Elligett was representing Miss Sidman.  Are you

25  going to tell me they're going to tell her, "Listen, you

1   have the option" -- 'cause there's a problem now with regard

2   as to whether she was competent or not, "You have the option

3   of voiding this thing"?

4           MR. VAKA:  Your Honor, I mean, she was also

5   concurrently represented by Mr. Kelly, who's the lawyer --

6           THE COURT:  You think Buell & Elligett -- and I'm

7   not casting aspersion on them.  That puts them in a -- in

8   the worst conflict position that I can imagine --

9           MR. VAKA:  Well --

10          THE COURT:  -- trying to -- they were going to

11  advise her, "You have a right to have this agreement which

12  gives us 295,000" -- "or $275,000" --

13          MR. VAKA:  Okay, Your Honor, would the advice have

14  been to set it aside so that we could then expose

15  Ms. Kirkwood's estate to the hundreds of thousands of

16  dollars incurred by Mr. Friscia's firm?

17          THE COURT:  No.  The issue is that if there was --

18  if I'm an attorney and I have a feeling that maybe

19  Miss Kirkwood was not competent when I executed this

20  document on her account, don't you think I have an

21  obligation to come forward and advise?

22          MR. VAKA:  If they believed her to be incompetent

23  and that they had acted --

24          THE COURT:  Look, on January 6th of 2011, just a

25  week or so after this thing was given to Judge Baumann,

1   Miss Sidman files that petition.

2           MR. VAKA:  But, Your Honor, I think the --

3           THE COURT:  Listen, there are disputed issues of

4   fact here which can be only resolved by me as the trier of

5   fact.  All right?

6           I'm going to deny the motion for judgment as a

7   matter of law.  That's not saying I'm going to rule for

8   Travelers or rule against them, rule for you or rule against

9   you.  All right?  Because at the next stage, then we get

10  into issues of credibility, believability, and things of

11  that nature, which I'll have to take up as the trier of fact

12  just as a jury.

13          MR. BUELL:  Your Honor, respectfully the estate,

14  my client, Miss Sidman, would adopt the arguments --

15          THE COURT:  All right, fine.  I don't want to cut

16  you off, but there are disputed issues here I need to

17  resolve as the trier of fact.

18          Do you have any witnesses, Mr. Tramont?

19          MR. TRAMONT:  We have none, Your Honor.  The

20  defense rests.

21          THE COURT:  All right.

22          MR. TRAMONT:  And I would renew our motion for

23  directed verdict.

24          THE COURT:  You mean judgment as a matter of law.

25          MR. TRAMONT:  Yes, sir.

1              THE COURT:  I'll deny it.

2              MR. VAKA:  Your Honor, just for the record, once

3    we've met our prima facia showing, the burden then shifts to

4    the defense under the *Coblentz* cases to come forward with

5    evidence demonstrating that the settlement agreement is --

6    doesn't satisfy the criteria that Your Honor talked about in

7    terms of the burden of proof.

8              In this case, the defense provided no expert

9    testimony concerning the settlement -- the reasonableness or

10   unreasonableness of the settlement agreement.  They brought

11   forth no expert testimony concerning Miss Kirkwood's health

12   and her ability or inability to have perceptions of what was

13   going on around her.

14             They brought in none of the physicians who

15   purportedly examined her as part of the guardianship

16   proceeding.  They simply have not met their burden at all.

17   And so, for purposes of the record, I understand what

18   Your Honor has said previously, but they have a burden, too,

19   and they've come forward with no evidence to satisfy that

20   burden.

21             THE COURT:  Well, that assumes you've made out a

22   prima facia case.  Listen, there's disputed issues of fact.

23   I'm going to have to resolve them.  Now, I'm now the trier

24   of fact.

25             You want to make any more argument, or do you want

1  me just to take this under advisement?  What's your --

2  what's your pleasure?

3         MR. TRAMONT:  I would prefer to make closing

4  arguments, Your Honor.

5         MR. VAKA:  We're happy to do an argument if you

6  find that would be helpful, Your Honor.

7         THE COURT:  All right.  You know, I'm not prepared

8  to give a ruling today.

9         MR. BUELL:  My client adopts the last argument as

10  well that Mr. Vaka made.  Thank you.

11         THE COURT:  Okay, to the extent that everybody is

12  making a motion for judgment as a matter of law, those

13  motions are denied.  There are disputed issues here of fact,

14  including issues of credibility, which I need to resolve as

15  the trier of fact.

16         All right, Mr. Vaka, you wish to argue?

17         MR. TRAMONT:  Your Honor, the other alternative

18  is -- that we would be fine with -- I know you've seen a lot

19  of paper in this case, but we just got these briefs.  He's

20  made arguments.  We'll be happy to submit a final trial

21  memorandum if Your Honor would give us a week to do it, and

22  we could waive oral argument here.

23         THE COURT:  What say you, Mr. Vaka?  You know, I

24  just got this thing from Miss Sidman and Florida

25  Policyholders regarding consent, another one based on full

1  faith and credit.  The other one I printed out based on

2  vouching in.  Are there any other memos that you filed,

3  Mr. -- is that it, Mr. Elligett?

4          MR. ELLIGETT:  I think that's it this morning,

5  Your Honor.

6          MR. TRAMONT:  And we haven't had time to review

7  it.

8          THE COURT:  I know you haven't.  I know you

9  haven't.

10          One thing I want to hear from you just right now

11  is this whole issue of *Coblentz*.  He says *Coblentz* doesn't

12  apply.  My feeling is yes, it does apply.  But he says

13  *Coblentz* was decided within the context of the insurance

14  company basically telling the insured, "Go take a hike.  We

15  don't care what you do."  But he says in this case you not

16  only told them to take a hike, but in this case they told

17  you, "We're going to seek $295,000."  Does that take it out

18  of *Coblentz*?

19          MR. TRAMONT:  No.  That's my understanding of how

20  *Coblentz* often happens, because the insured tells the

21  insurer, "Look, if you don't come and defend, if you don't

22  settle, we're going to go get a consent judgment.

23          Back to Your Honor, we cited a case to you in our

24  briefs, in our final trial memorandum, called *Petro vs.*

25  *Travelers Casualty & Surety Company of America*, decided by

1    the Northern District of Florida in 2014; and I'm familiar

2    with that case 'cause I represented Travelers, and they

3    tried to -- the insured told Travelers, "Look, we're going

4    to settle if you don't pay your policy limits, or you're

5    going to pay in excess of your policy limits in that case,"

6    and we said, "Look, we don't think that's merited.  We don't

7    think you should settle."

8            THE COURT:  But did they give you an exact amount?

9            MR. TRAMONT:  Yeah, right, they did.  As I recall,

10   Your Honor, they did and just said, "No, we're not going to

11   pay," and they entered into that, and they signed the cause

12   of action under the policy to the plaintiffs, and the

13   plaintiffs sued, and that was a *Coblentz* agreement.

14           THE COURT:  All right.

15           MR. TRAMONT:  That's how it happens, Your Honor.

16   I'm not -- I don't know of any requirement that the

17   insurance company be kept in the dark, and I can't imagine

18   how that would happen.

19           And I just want to point out, you said to

20   Mr. Vaka, "What do you think would have happened if

21   Mr. Tramont would have showed up?"

22           Okay, I go in there.  Judge Baumann doesn't know

23   me.  He's been dealing with these attorneys who he respects,

24   and --

25           THE COURT:  Maybe that wasn't the --

1      MR. TRAMONT:  I would have gotten creamed.

2      THE COURT:  Wait a minute.  Maybe that was an

3  unfair question, because we're just speculating.

4  Judge Baumann may have said, "Welcome, Mr. Tramont.  I'll

5  hear from you."  He may have said, "I don't want to hear

6  from you."  We don't know.  It never happened.  So, that's

7  just pure speculation.  I'm not going to consider that at

8  all.

9      Now, do I need --

10     MR. TRAMONT:  Can I point -- can I point out one

11 other thing that just struck me?  And, you know, every once

12 in a while you have these epiphanies, and sometimes you're

13 too late.  But they said that -- that Miss Kirkwood had

14 agreed to the material terms.  She didn't.  She agreed to

15 the goal.  She agreed to the result.

16     THE COURT:  I understand that.  You've made that

17 point perfectly clear.

18     MR. TRAMONT:  All right.

19     THE COURT:  Now, I'm always one for trying to

20 conserve client resources.  Do you feel like I need the

21 transcript in terms of your memos?

22     MR. TRAMONT:  The transcript of the entire --

23     THE COURT:  Of this hearing, yeah.

24     MR. TRAMONT:  I don't think you need the

25 transcript of the trial.  We would get the transcript of

1  this hearing so we could address your questions.

2          THE COURT:  All right, so you don't think a

3  transcript is necessary?

4          MR. TRAMONT:  It certainly wouldn't hurt,

5  Your Honor.  We've got the transcript from yesterday.  We

6  have that.  We ordered that.  We got it last night.  I'm

7  sure -- I don't know if Mr. Buell has gotten a transcript

8  for the entire proceeding.

9          THE COURT:  Mr. Buell, have you gotten any of the

10 transcript?

11         MR. BUELL:  Just from yesterday, Your Honor.

12         THE COURT:  Okay.

13         MR. TRAMONT:  I think Your Honor pretty -- has a

14 good recollection of who said what.

15         THE COURT:  Yeah, I know, but the trouble is, as

16 time goes by, your recollection fades.

17         MR. TRAMONT:  We're happy to order the

18 transcript --

19         THE COURT:  Well, I know, but --

20         MR. TRAMONT:  -- and split costs with them.

21         THE COURT:  Are y'all willing to split the cost,

22 Mr. Buell?  Because I want to make a -- Mr. Vaka?

23         MR. VAKA:  Yes, Your Honor.

24         THE COURT:  All right.

25         MR. VAKA:  But we're kind of aligned, so it would

```
 1   be 50/50, I think.
 2               THE COURT:  I understand that.  All right.
 3               How long will it take you?  No rush.  How long?
 4               THE COURT REPORTER:  Two weeks.
 5               THE COURT:  Okay.  Okay.
 6               MR. TRAMONT:  Your Honor, if we could have a
 7   reasonable time after that to put our briefs together.
 8               THE COURT:  I'm going to do that.  You know I'll
 9   do that.  I'm not going to hard-line you.
10               Okay, today is -- what's today?  The 5th?
11               MR. TRAMONT:  August 14th.
12               THE COURT:  The 14th.  The court reporter says she
13   can have the transcript within two weeks.  So, the
14   transcript will be filed no later than August 28th; and if
15   the reporter runs into any problem, she'll let me know, and
16   I'll alter the schedule; okay?  Because I don't want to put
17   her under the gun.
18               All right, transcript's filed August 28th.  How
19   much time do you need?
20               MR. TRAMONT:  No more than a week.
21               THE COURT:  Mr. Vaka?  Mr. Buell?
22               MR. VAKA:  Your Honor -- forgive me, I didn't know
23   we had gotten past the part of having closing arguments
24   today.  We would prefer to give you a closing argument right
25   now and not provide any more paper and any more writings.
```

```
 1              I think Your Honor, in denying the motions for
 2    summary judgment --
 3              THE COURT:  You see, the thing is, though, you've
 4    given me -- now you've brought in this whole concept of
 5    vouching in.
 6              MR. VAKA:  They can certainly respond to that.
 7              MR. TRAMONT:  No, I can't.
 8              MR. VAKA:  Well, with a written response.  I don't
 9    have an objection to them doing that.
10              THE COURT:  No.  No.  You know, this is a very
11    unique case.  All right?  All because of a bad lawn.  And I
12    want to make an informed decision, and you're going to
13    obviously be arguing to me cases that are in your memo
14    before I've have a chance to read them.  I may read them,
15    and you may argue to me about them, and I may disagree with
16    your argument.
17              So, how much time do you need to file a memo after
18    the transcript's filed on August 28th?
19              Two weeks?
20              MR. VAKA:  Two weeks would be great.
21              THE COURT:  All right, here's what we're going to
22    do:  All right, initial briefs by September 11th.  If you
23    want to file a rebuttal brief, September 18th.  That give
24    everybody plenty of time?
25              What?
```

1          MR. TRAMONT:  I asked him if he wanted to waive

2   rebuttal.  I mean, I've had enough paper, too.

3          THE COURT:  Well, you know, if you don't want to

4   file one, you don't have to.  I'm just saying the rebuttal

5   briefs, if the parties want to, September 18th, and I'll do

6   my best to issue a decision as soon as possible.

7          MR. VAKA:  Your Honor, would you consider an oral

8   argument subsequent to the submission of the briefs?

9          THE COURT:  If I -- if I feel it's necessary, I'll

10  consider -- I'll consider it, yeah.

11         MR. VAKA:  Thank you, Your Honor.

12         THE COURT:  Okay.  Anything else?

13         MR. TRAMONT:  The only thing you could do,

14  Your Honor, I leave town the next day.  I'm -- I'll do what

15  I can.

16         THE COURT:  No.  I'll set an oral argument -- if I

17  need more argument, I'll set a date that's convenient to

18  everybody's calendar.  Don't worry about that, Mr. Tramont.

19         MR. TRAMONT:  Thank you.

20         THE COURT:  All right.

21         All right, gentlemen.  It's been an interesting

22  case.

23         MR. TRAMONT:  Thank you.

24         (Adjourned at 9:55 a.m.)

25                    - - - - -

CERTIFICATE OF REPORTER

1

2

3

4     I, SHERRILL L. JACKSON, Federal Official Court

5  Reporter for the United States District Court, Middle

6  District of Florida, Tampa Division,

7     DO HEREBY CERTIFY, that I was authorized to and

8  did, through use of Computer-Aided Transcription, report in

9  shorthand the proceedings and evidence in this cause, as

10  stated in the caption on page 1 of this transcript, and that

11  the pages numbered 1 to 47, inclusive, constitute a true and

12  correct transcription of my shorthand report of said

13  proceedings and evidence.

14     IN WITNESS WHEREOF I have hereunto set my hand

15  this 27th day of August, 2015.

16

                                   */s/Sherrill L. Jackson*

17                   _____

                                   SHERRILL L. JACKSON, RPR, FPR
18                                 Federal Official Court Reporter